# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3549-22

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

S.W.,

     Defendant-Appellant,

and

THE BIOLOGICAL FATHER(S)
OF N.D.W., A.J.W., and K.H.,
WHOMSOEVER HE MAY BE,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF N.D.W.,
K.H., and A.J.W., minors.

_____

Submitted March 19, 2025 – Decided May 2, 2025

Before Judges Currier, Marczyk, and Paganelli.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FG-16-0044-22.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Christine Olexa Saginor, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Michelle McBrian, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minors N.D.W. and K.H. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; David B. Valentin, Assistant Deputy Public Defender, of counsel and on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minor A.J.W. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd Wilson, Designated Counsel, on the brief).

PER CURIAM

Defendant S.W. (Sara) appeals from a judgment terminating her parental rights to her son K.H. (Kaleb) and daughters N.D.W. (Nora) and A.J.W. (Amy).[1] She asserts the trial court erred in finding the Division of Child Protection and Permanency (the Division) satisfied all four prongs of the best interests of the

---

[1] To protect individuals' privacy, we use initials and pseudonyms. R. 1:38-3(d)(12).

child test set forth in N.J.S.A. 30:4C-15.1.  Specifically, Sara argues that the trial court erred in concluding that the children had been harmed by their relationship with her and that she was unwilling or unable to remediate perceived issues with her parenting, that the Division did not demonstrate it made reasonable efforts to provide her with services or consider alternatives to termination, and that the trial court gave undue weight to expert testimony presented by the Division as to the best interests of the children.

After a careful review of the record in light of the applicable principles of law, we are satisfied the court's decision to terminate Sara's parental rights is supported by substantial and credible evidence.  We affirm.

Sara has four children:  R.W. (Ryan), born in September 2002, who is not a subject of this litigation[2]; Kaleb, born in August 2007; Nora, born in August 2013; and Amy, born in May 2018.  None of the children's fathers have been identified.

Pre-Removal Contacts with the Division

In 2010, when Ryan was eight and Kaleb was two, the Division received a referral alleging that Kaleb was unattended on a fire escape at the family's apartment.  Sara admitted to falling asleep and not waking until police arrived

---

[2]  Ryan has severe autism.

at her door. The Division closed the case without a finding of abuse or neglect after advising Sara to put appropriate locks on all the doors and windows of the home.

In 2012, the Division received several neglect allegations against Sara after she was evicted from her home due to non-payment of rent. The director of the shelter where Sara had been staying reported that Sara left her children with other residents and stayed out late at night without notifying staff. Sara refused the Division's offer of services. On another occasion, Sara failed to meet Ryan's bus after school to take him home. She explained that she asked another resident of the shelter to pick Ryan up and babysit him, but the shelter advised the Division that Sara did not follow its protocol for this arrangement.

Later that year, Sara and the boys moved into an apartment with the help of a temporary rental assistance grant. Shortly thereafter, the local police informed the Division that Ryan was found outside wearing only a coat and underwear and trying to board a bus. Kaleb reported that Sara had left him and Ryan alone the previous night.

Sara said she went to "hang out" in New York City and left the boys with a babysitter she knew only as "Simone," but she did not know this person's contact information. Sara told the Division she had no family to care for her

4

sons. She also admitted that she had left the boys with other babysitters she could not name. Sara was substantiated for neglect, and Ryan and Kaleb were placed in foster care.

In January 2013, Sara tested positive for cocaine, and she admitted to using illegal substances. After she completed court-ordered services through the Division, the family was reunified in January 2014.

During the period between 2014 and 2016, the Division received referrals for the family when Sara called 9-1-1 to report an "evil presence" in her home that prevented her from sleeping, when there was a lack of gas service to the home due to Sara failing to pay the bill and refusing the Division's assistance, and when Sara allowed Kaleb and Ryan to go fishing on their own and a fishing hook became lodged in Ryan's leg. Throughout this time, Sara often failed to communicate with the Division and did not provide case workers access to her home.

In April 2014, Kaleb reported that Sara had punched him in the stomach and struck him on previous occasions. However, because the child had no visible bruises, the Division determined the allegation was unfounded. In August, the Division did substantiate Sara for neglect related to one-year-old Nora. The baby had suffered blistering and second-degree burns to her lower

legs after being left in hot water in the sink by her mother. Sara claimed she had left Nora under seven-year-old Kaleb's supervision, and that the boy had turned the hot water on because he was "always trying to provoke his sister." Sara's landlord reported to the Division that the boys often ran around unattended.

After the 2014 burning incident, the Division instituted in-home Emergency Child Aid Program services to ensure the children's safety. It also referred Sara for a psychological assessment and provided in-home parenting skills training.

In May 2015, the Division received an allegation that Nora was almost hit by a car while outside unsupervised with Kaleb. Kaleb told the Division worker that after Sara left him and his sister alone at a park while she went for a jog, Nora wandered toward a parking lot, where she was almost struck by a car.

In February 2016, Sara was evicted from the apartment because she was $9,000 in arrears on her rent. The family moved in with a friend of Sara's but later relocated to a shelter. In August, the shelter staff saw Sara put Kaleb in a chokehold and kick him in the stomach. Kaleb reported to the Division that his mother hit him when he didn't "watch his brother and sister." A Division

6

investigator observed that the family's apartment at the shelter had "trash all over the floor."

Thereafter, the Division paid for Sara and the children to stay at several hotels. The Division also provided Sara with information about therapy for Kaleb and preschool assistance for Nora, and apartment listings to help her find housing. Sara was unemployed but received government assistance at that time. She was not responsive to the Division's communications. The Division later assisted the family to move into a shelter.

During the family's stay at the shelter, staff complained that Sara stayed in bed "all the time" and did not watch her children. A counselor made attempts to work with Sara to improve her time management skills but they were unsuccessful. The Division also transported Sara to a job fair, advised her of a local business that was hiring, helped her prepare for possible job interviews, and arranged babysitting for the children. Sara did not follow up with any of the offered assistance.

In May 2017, the Division helped the family move to a YMCA shelter, where they remained for a month. The Division continued attempting to assist Sara with "obtaining stable housing and devising a budget." The Division advised Sara that if, after thirty more days, she could not find a home, it would

7

no longer pay for her housing and the children would be at risk for removal. YMCA staff reported that Sara never left the shelter during the day to apply for jobs or attend interviews.

In June 2017, Sara attended a psychological evaluation with Robert Kanen, Psy.D. Sara's test scores revealed that her functioning IQ was sixty-eight, in the intellectually deficient to borderline range of cognitive ability. Dr. Kanen opined that her cognitive limitations impacted her ability to supervise and care for her children. He also found that Sara had "severe" personality problems, including extreme self-centeredness, attention-seeking behavior, and minimal awareness of her own unreliability. Dr. Kanen concluded that Sara could not provide her children with "a permanent, safe and secure home now or in the foreseeable future."

The family moved into the home of Sara's uncle, E.W., in June 2017. On July 18, a Division investigator spoke with E.W.'s wife, J.W., who reported that Sara gave the children no structure or discipline and did not seem to understand how to do so. J.W. said Sara stayed in the attic or basement of the house most days, did not attend to her children, and spent money on unnecessary items. Kaleb confirmed that his mother did not supervise him or his siblings. Sara said she did look after them, when J.W. was not around.

A-3549-22

On August 17, E.W. and J.W. demanded that Sara and the children leave their home. J.W. reported that Sara had stolen money from her, and that when J.W. confronted her, Sara called the police and claimed J.W. stole her cell phone. Sara had made no effort to obtain employment or save money while staying with E.W.'s family.

The Division executed an emergency removal of all three children that day. Nora was placed with resource parent D.J. (Doreen), and Kaleb was placed into a treatment home because he needed special care due to behavioral issues.

Post-Removal

In October 2017, Sara told the Division she was looking for a new job. She refused to participate in therapy or attend a new psychological evaluation. She told the Division that "rushing will not help her get her children back." Sara eventually provided the Division with the address of a friend with whom she was residing part-time, but she said the children could not join her there.

Between August 2017 and May 2018, Sara only sporadically attended weekly visitation with her children, often failing to confirm she would attend or simply not showing up. Ultimately, she visited with the children fewer than a dozen times during this period, often claiming she was "busy."

On May 17, 2018, Sara was admitted to the hospital. She was eight months pregnant but denied she knew this before going to the hospital despite noticing her belly "swelling up" and feeling "movement" inside. On May 25, Sara told the Division that her aunt, M.W. (Mary), would allow her and the children to reside in her home in Canada. When the Division contacted Mary, she said she could only care for Nora.

Amy was born in May 2018. Sara refused to identify the baby's father. Although Sara claimed she was living with an uncle at the time, the uncle denied it and said he was not financially supporting his niece. Sara remained unemployed. On June 4, 2018, the Division was granted custody of Amy, who was placed with resource mother J.B. (Jaime).

Also in June 2018, Sara attended an updated psychological evaluation with Dr. Kanen, who again reported that Sara had a low level of cognitive ability and was not conscious of her own limitations. He noted she was unable to independently support herself and had no plan to provide for her children. Dr. Kanen said Sara was likely unable to adequately recognize dangers to her children, was "extremely self-centered," and tended not to "learn[] . . . from her mistakes." He concluded that Sara's issues were unlikely to change even with services.

10

Sara was also evaluated by a psychiatrist, Michael Gentile, M.D., during which she reported that she was employed part-time at a hookah café. Dr. Gentile found that Sara was intellectually disabled and unable to function as a parent. The Division's notes indicate Sara was homeless and looking for employment. Thereafter, Sara missed three scheduled and rescheduled family team meetings with the Division.

During a visit with Amy, Sara picked up the two-month-old baby and dangled her by her hands. She then picked the baby up by her feet and pulled on her torso. Despite Amy screaming and crying, and a Division worker's attempt to intervene, Sara said this was something people do to "stretch a child's body out and get rid of creases in the child's limbs faster." Sara also watered down Amy's formula, criticized Kaleb's weight, and yelled at Nora when she referred to her resource parent as "grandma."

In August 2018, Kaleb told the Division case worker that he did not want to be reunified with his mother because he thought he would only be removed again, and he did not want to be responsible for caring for his siblings anymore. He said Sara was "crazy" and "[did] not care" about the children, and he felt "safe and at peace" with his resource family.

11

In September, Sara moved in with another friend. She reported that her life was "very complicated right now" and that she "need[ed] more time" before her children could live with her again. She was still unemployed. Sara was often late for visits with the children. Kaleb complained that during visits, his mother either didn't pay attention to him or called him "fat."

In the next few months, Sara stopped going to a parenting program and continued to be late for or didn't confirm visits with the children. In December 2018, Sara told the Division she needed "a break from visitation" so she could look for work and complained that visits took up too much of her time. The Division consolidated her two visits per week into one longer visit.

The Division ruled out a possible relative placement after Sarah refused to cooperate. Sara said she did not want to provide the Division with the names of any other relatives because she did not want to burden them. She also refused to give the Division her address. Sara continued to miss visits with the children and was significantly late for others. She remained unemployed.

In February 2019, Doreen expressed interest in adopting Nora. Thereafter, the trial court approved the Division's plan of termination of Sara's parental rights followed by adoption, noting that she had failed to complete

services, was sporadic with visitation, and had no stable home.  The Division initiated its guardianship litigation.

During this time, Sara was living in the Bronx.  The Division continued to transport her to visits with the children and to attend therapy sessions. However, Sara often kept drivers waiting at her father's home because she was not ready to leave when they arrived.

In March, Sara underwent a psychological evaluation with Mona Krishan, Ph.D.  Dr. Krishan found that Sara had "compromised cognitive abilities with borderline intellectual ability," and "demonstrated an inability to acknowledge her limitations and problems or to address them with responsibility."  Dr. Krishan concluded that these factors would interfere with Sara's ability to care for her children without ongoing support and monitoring.

The Division continued trying to find relative placements for the children to no avail.  At one point, Mary indicated that she could care for Nora and Amy, but not Kaleb.  Sara continued living in her father's one-bedroom apartment, where the children could not join her.  She refused to permit the Division access to her father's home, and while she said she was employed as a bartender, she did not provide details about her employer or compensation.  The Division indicated it was willing to pay for a security deposit and furniture for an

A-3549-22

apartment if Sara provided proof she could pay rent, but she never provided evidence of employment. The Division also provided Sara with information regarding therapists in the Bronx, but she did not contact any of them.

In October 2019, Alison Strasser Winston, Ph.D, conducted a psychological evaluation of Kaleb, during which he reported that Sara had hit him with "her hands, belt, anything she had." He also said it was "upsetting" and "confusing" when the family moved from "place to place." Kaleb emphasized that he did not want to return to Sara's care and wanted to be adopted. Dr. Winston found that Kaleb had "clearly experienced significant trauma as a result of his history of instability, as manifested by his behavioral issues . . . and his frequent refusal to attend visitation with" Sara. While she found that Kaleb had some affection for his mother, she concluded that he would experience minimal emotional impact if his relationship with her ended. By contrast, Dr. Winston said Kaleb would experience enduring harm if reunified with Sara, which would exacerbate his anxiety, insecurity, and anger.

During this time frame, Division workers noted that Sara was inattentive to her children during visits; she fell asleep twice, refused to kiss and hug Kaleb when he asked, and shoved and ignored him. On one occasion, when Kaleb did

not want to attend the visit because he wanted to participate in after-school activities, Sara asked why Kaleb could decline visits, but she could not.

The Division used its immigration legal specialist to explore whether the children might be placed with Mary in Canada. The Division learned Kinship Legal Guardianship (KLG) would not be an option, and Mary would have to initiate the adoption process through an accredited Canadian agency. Without adoption, the children might not be eligible for school or insurance in Canada. Kaleb told Sara he wanted to remain with his resource family. Nora also told the Division she did not want to move to Canada, because she "[didn't] know [her] aunt or anyone there." Later, Sara told the Division she wanted the children to be placed with Mary in Canada.

In late 2019, Sara underwent a psychiatric evaluation with Jenny Blanchard, D.O. Sara told Dr. Blanchard she was a songwriter and screenwriter, and that she came to the United States while she was in high school to compete as a runner. Dr. Blanchard characterized Sara's thought processes as "grandiose with delusions including paranoid type." Dr. Blanchard diagnosed Sara with unspecified bipolar and unrelated disorder with psychotic features.

During several months in 2020, Sara did not respond to the Division's communications or visit with the children. By the end of the year, she told the

15

Division she only wanted to have virtual visits with the children. She ultimately did not attend any of the scheduled virtual visits. Thereafter, she stopped having any contact with the Division.

Dr. Kanen conducted a bonding evaluation of Nora and Doreen in October 2020. The psychologist concluded that Nora was securely attached to Doreen and would suffer serious harm if separated from her. He found that Doreen was "warm, nurturing, and attentive" to Nora, who saw her as a parent.

After discussions regarding the differences between adoption and KLG, Kaleb's resource parents indicated they would prefer KLG. Therefore, the Division's long-term permanency goal for Kaleb was KLG with his resource family, and its goal for Nora was adoption by Doreen.

In January 2021, Sara attended another psychological and bonding evaluation with Dr. Kanen, who found that Sara had no awareness that the removal of the children from their resource parents could have a negative impact on them. Dr. Kanen stated that Sara also took no responsibility for the children being out of her care and did not discuss any plans to work toward reunification. Sara said she had no weaknesses as a parent. Her IQ testing result remained within the "borderline" range.

A-3549-22

Dr. Kanen opined that Sara's "severe parenting deficits" were "chronic in nature" and had not changed since the last evaluation. He said her "personality problems" were "enduring, pervasive, inflexible . . . and not amenable to treatment that would result in long[-]term improvements of functioning." As a result, he concluded that Sara was unable to provide the care and supervision her children needed, predicting that if they were returned to her care, she was likely to "leav[e] them unattended to get her own needs satisfied."

During the bonding evaluation, Dr. Kanen observed that Kaleb and Nora interacted primarily with each other, while Sara gave most of her attention to Amy. Nora did not seek Sara's attention and had no issue separating from her at the end of the session. Sara brought Christmas presents only for the girls, but Kaleb showed no reaction to being left out. Dr. Kanen concluded that Nora and Kaleb had an impaired attachment to their mother, that Amy had no attachment to her at all, and that none of the children would suffer serious and enduring harm if permanently separated from her.

Dr. Kanen also performed a bonding evaluation of Nora and Amy with Mary. Mary said she planned to find a place to live part-time in New Jersey so the children could get to know her. Mary had met the children once the year before and had subsequently participated in some virtual visits. Dr. Kanen found

17

that Nora and Amy had no attachment to Mary; he noted that Nora did not treat Mary as a parental figure and appeared relieved when the evaluation was over. Dr. Kanen stated that Nora would suffer serious harm if she was removed from Doreen and placed with Mary. He similarly found that Amy was strongly attached to Jaime and would suffer enduring harm if removed from her. The Division ruled out Mary as a placement option for Nora.

In February 2021, Sara informed the Division she was residing in New Jersey, but she refused to provide her address and said the children could not live with her. She was unemployed and not looking for a job. Sara continued requesting virtual visits with the children, but the court ordered the visits were to be in-person.

First Guardianship Trial and Aftermath

The first guardianship trial, which addressed only Nora and Amy, was held in June and July 2021 before Judge Barbara J. Buono Stanton. Sara attended the trial only sporadically, even though being offered the ability to attend virtually. When she did connect via Zoom, Sara was often admonished by Judge Buono Stanton for not paying attention to the proceedings; she left the call to change clothes, put on makeup while on video, sometimes connected from public places, and failed to reconnect after lunch recesses. One day, when a

18

Division worker agreed to pick Sara up to ensure her timely attendance, Sara was not at the address she gave and texted that she had gone to another city instead. The reasons Sara gave for her lack of attendance and attention included that she "had things to do" or had "dozed off."

On August 31, 2021, Judge Buono Stanton denied the Division's complaint to terminate Sara's parental rights as to Nora and Amy. The judge concluded that the Division satisfied prongs one and two of the best interests of the child test under N.J.S.A. 30:4C-15.1.

In addressing prong three, the judge found the Division had provided Sara reasonable and adequate services, but it did not fully consider alternatives to termination. Specifically, the judge stated the Division did not fully consider Mary and assist her with either moving to New Jersey or adopting the children in Canada.

As to prong four, the judge found the Division had not given Nora and Amy a chance to bond with Mary. The judge also stated the Division needed to inquire further into whether the girls' adoption into different homes would be in their best interests.

After Mary advised she was interested in adopting all three children, Sara said she would surrender her parental rights to Mary. The Division consulted

with immigration specialists and Canadian authorities to explore various options for the children to be placed with Mary. The Division also initiated regular overnight visits with Mary, and virtual visits twice a week.

At the time, Kaleb still resided in the same treatment home, but his caregivers were no longer interested in KLG, and he had been recommended for discharge from the residence. Kaleb expressed that he wanted to remain in his current community, in a regular resource home, or with Mary.

The Division paid for Mary to stay in a hotel in New Jersey to visit with Amy and Nora on the weekends and supported her in developing a relationship with all three children. Mary said she planned to apply for a work visa so she could move to the United States. The Division agreed to help Mary find an apartment in New Jersey and to pay the security deposit.

One of Sara's relatives offered Mary a job with his business, when she relocated to New Jersey. Mary stated that she was willing to do KLG with the children, but that she preferred to adopt them. The court accepted the permanency goal of adoption by a relative. Sara had stopped responding to any Division communications and when she came to visits with the children, she arrived very late and did not interact with them.

In March 2022, the Division paid $4,400 to assist Mary to obtain an apartment in New Jersey and said it could pay her a monthly stipend of $907 per month once Kaleb was placed with her and additional money when Amy and Nora joined her. The apartment required renovations to make it ready for Mary and the children. In the meantime, the Division offered to pay for Mary to stay in a hotel with Kaleb while the girls remained with their resource mothers, but Mary declined.

On March 16, 2022, the Division filed its second complaint for termination of parental rights. The same day, Kaleb told the Division he no longer wanted to visit with his mother, but that he wanted to see his sisters and Mary. A few days later, the Division provided Mary a "KLG versus Adoption Fact Sheet" and asked her to review and sign it. Although Sara continued to miss visits with the children, she told the Division she had changed her mind and did not want the children to visit with Mary or be placed with her.

Sara attended a psychological and bonding evaluation with Karen Wells, Psy.D., in July 2022. She said she was currently residing in a friend's home. Sara admitted she could not reunify with the children at that time, but also said she did not trust Mary and did not want the children placed with her. She also complained about Jaime, claiming she was "shady" and forced Amy to call her

"mom." Sara said she wanted Amy removed from Jaime although she had no concerns about Jaime's ability to care for the child. Sara had no plan to obtain independent housing for herself and the children, and Dr. Wells said she did not appear distressed about not being with them.

Dr. Wells found that Sara displayed delusional and paranoid thinking and interpersonal relationship issues, and that she was impatient, easily frustrated, and emotionally volatile. She diagnosed Sara with unspecified bipolar and personality disorders with psychotic, paranoid, and narcissistic features.

Dr. Wells concluded there was "little to no indication that [Sara] possess[ed] the capacity, and perhaps lack[ed] the willingness, to make substantial life changes to facilitate reunification." The psychologist expressed concern about Sara's ability to assume responsibility for her actions, and said Sara could not effectively provide nurturing, protection, or stability for the children in the foreseeable future. She stated that placing the children in Sara's care would subject them to "disorder, dysfunction, and chaos." Dr. Wells opined there were no services that could help Sara alter her chronic inability to parent.

During the bonding evaluation, Dr. Wells observed that while the children had a familiarity with Sara, there were no indications that any of them perceived her as their psychological parent. Sara's primary focus was on Amy. In contrast,

22

when Kaleb asked Sara to braid his hair, she told him she could not because of her fingernails. Sara also criticized Kaleb's acne and weight. When the evaluation was over, the children separated from Sara without distress.

Dr. Wells concluded that Kaleb and Nora had only an "insecure" and "fluid" attachment to Sara, while Amy had no emotional attachment to her. She defined "fluid" as an understanding by the child that the adult is not a stable presence in the child's life. Dr. Wells similarly found that Sara did not seem to have an attachment to the children. She concluded that if Sara's parental rights were terminated, the three children would not experience any emotional or psychological harm.

Dr. Wells also conducted a bonding evaluation of Amy with Jaime and Jaime's adoptive son L.B. (Liam). During the interview, Jaime said she was committed to adopting Amy, and did not want KLG because of concerns about Sara's decision making and inconsistency. She reported that Amy had behavioral problems after some visits with Sara. During the evaluation, Dr. Wells observed that Jaime was affectionate with Amy and supervised and managed her appropriately. She found that Amy had a secure bond with Jaime, sought out her attention, and viewed her as her psychological parent. She also noted that Amy and Liam related to each other like siblings. Dr. Wells

23

concluded that Amy would experience "a profound sense of loss, grief[,] and distress" resulting in "unnecessary and undue trauma" if separated from Jaime.

Dr. Wells also conducted a bonding evaluation of the children and Mary. She observed that Mary appropriately balanced her attention among the children and related to them "in a loving, gentle and kind manner." Nevertheless, Dr. Wells found that Mary did not have the capacity to provide permanency for the children and she continued to be indecisive as to whether she would relocate at all, negatively affecting the children's trust in her. She recommended the Division pursue alternate plans for permanency besides Mary.

Shortly thereafter, Mary told the Division she did not know when she would move to the United States or how she would afford to do so and care for the children. She said the relative was no longer offering her a job. The Division workers continued trying to assist and encourage Mary, but she said she could not afford rent in New Jersey, and she asked the Division for $2,000 in monthly assistance.

In August 2022, the Division ruled out Mary due to her lack of housing in the United States and the fact that she could not commit to obtaining a home here in the future. Despite the Division's assistance, she had missed several move-in dates at the apartment renovated for her and eventually lost the home.

In addition, she had not completed a resource parent application, had not spoken with an immigration attorney, and still needed to complete fingerprinting and resource home paperwork. Around this time, Kaleb joined Amy in Jaime's resource home and reported that living in that home was "great."

In October 2022, Mary indicated that she wanted to adopt the children in Canada. However, she did not obtain suitable housing for all three children in Canada or provide information regarding her health insurance or other requirements.

Dr. Wells conducted bonding evaluations of all three children with Jaime, and Nora with Doreen.[3] Jaime said she was committed to adopting Kaleb and Amy, and Doreen still wanted to adopt Nora. Kaleb was amenable to adoption by Jaime and said that while he was not opposed to visiting with Sara, he wanted to be able to decline if he had other plans. Nora wanted to live with Mary, her mother, or Doreen, in that order. Doreen said that if she adopted Nora, she would continue to permit the child to have contact with Sara and Mary.

---

[3] Nora was included in the evaluation with Jaime because she had frequent visits with her siblings at Jaime's home and Jaime had expressed a willingness to adopt her as well, if necessary. Dr. Wells observed that Nora exhibited no evidence of a parent-child type bond with Jaime but appeared comfortable around her.

A-3549-22

Dr. Wells found that Kaleb, who was almost sixteen, was thriving in Jaime's home and would benefit from permanency there alongside four-year-old Amy. Kaleb had begun calling Jaime "mommy" and told Dr. Wells he wanted to stay with her. Dr. Wells found that Kaleb had bonded with Jaime because he "wants somebody to be in his life who is going to be reliable and predictable and she's offering that for him." She opined that if Kaleb was separated from Jaime, this would add to the negative impacts he had already experienced due to the multiple separations and rejections from his mother, prior resource family, and Mary. Dr. Wells further said that if Mary was revisited as a caretaker, it would be difficult for Kaleb to accept her as a secure parent, and he would struggle with relocating to Canada because he was well-established socially in his school and current community. Dr. Wells again found that Amy was securely bonded to Jaime and would suffer "devastating" harm if removed from her.

Dr. Wells found that Nora's interactions with Doreen demonstrated an intact and secure attachment and Nora viewed Doreen as her psychological parent. Dr. Wells opined that the reason for Nora's stated preference to live with Sara was that Nora wanted to have the same kind of relationship she saw other girls share with their mothers. She thought Nora preferred Mary because she was fun to stay with and treated the children kindly.

26

However, Dr. Wells observed that Nora had lived with Doreen, whom she called "grandmom" and "mommy," for several years, and felt "secure" in her home. She opined that while Nora might more easily transition to Mary's care than Kaleb or Amy would, if she moved to Canada, she would lose the regular contact she had with her siblings—a relationship Dr. Wells characterized as "paramount."

Sara failed to appear at a scheduled psychological and parenting fitness evaluation with Eric Kirschner, Ph.D. However, Dr. Kirschner conducted bonding evaluations of the children with their respective resource parents, and of Nora with Mary based on her stated preference to live with her great-aunt. Kaleb was unwilling to participate in a bonding evaluation with Mary, and said he did not want to live with her.

Nora again stated that she would be "happy" to live with Mary, but also said she "want[ed] to stay where" she was. At this evaluation, Nora did not express any desire to live with Sara, saying that her first preference was to be placed with Mary and her second was to stay with Doreen. Dr. Kirschner found that Nora acted "emotionally distant" and "quiet" with Mary. He suggested that Nora's stated preference could be explained by the "vacation-like" quality of

their visits.  In contrast, Nora was "energetic" and "interactive" with Doreen and stayed close to her during the evaluation.

Dr. Kirschner concluded that Nora had a secure bond with Doreen and viewed her as a psychological parent.  He testified that if she was removed from Doreen, she would experience psychological harm and trauma that could affect her capacity to trust others and maintain her self-concept.  While stating that preserving a biological family was important, Dr. Kirschner found that Nora was not attached to Mary and would not be harmed if not placed with her, and that Mary would not be able to mitigate the impact of Nora being removed from Doreen.

Dr. Kirschner found that Kaleb was "in desperate need of permanency" without further delay.  He noted that Kaleb had "begun to develop a parent-child bond with" Jaime and wanted to remain with her.  During the evaluation, where all three siblings were present along with Liam, all of the children were "playful" together, and Kaleb referred to Jaime as "mommy."  Dr. Kirschner concluded that removing Kaleb from Jaime and his sister Amy would do him more harm than good.  Dr. Kirschner also opined that all three children urgently needed permanency.

A-3549-22

Second Guardianship Trial

The second guardianship trial took place on nonconsecutive days between February and June 2023 before Judge Buono Stanton. Kaleb was almost sixteen years old, Nora was almost ten, and Amy was five.

The parties stipulated that all testimonial and documentary evidence admitted in the first trial would be admitted and considered by the court at the second trial. They also stipulated to the court incorporating its factual findings from its August 31, 2021, opinion and adopting them as to Kaleb, who had not been a party in the first trial.

Several caseworkers testified as discussed above regarding Sara's lack of communication with the Division, her refusal to permit entry into anywhere she was living, her failure to attend family team meetings and appointments, and the lack of any interaction with the children during the visits she did attend. The Division also explained the exhaustive efforts it took regarding Mary in her search for a home in the United States and renovating the apartment the Division obtained for her. However, as stated, Mary did not move to this country, and did not commence the international adoption process.

The caseworkers testified regarding their multiple discussions with Jaime and Doreen about KLG and adoption and that both resource parents preferred

adoption. Both Jaime and Dorren testified. They described the frequent visits they provided for the siblings together as they lived only ten minutes apart. They planned to maintain contact between the siblings and with Mary after adoption.

Drs. Kirschner and Wells testified as described above. Both advised reunification with Sara was not a possibility. Dr. Wells also opined that adoption would be a better option for all the children than KLG, because it would provide them with more certainty and a sense of permanency.

Court's Decision

Following the close of evidence, Judge Buono Stanton issued a comprehensive written decision and order on June 14, 2023, terminating Sara's parental rights to the three children.

Judge Buono Stanton found the Division workers' testimony was credible. She also found that Doreen and Jaime were credible witnesses, commenting that "[t]heir candor (and emotion) as reflected in their voices garnered believability of their testimony."

The judge found that the Division had worked with Sara to locate stable housing; paid for her and the children to stay in shelters and hotels; offered visits with the children after their removal and provided transportation to facilitate those visits; referred Sara to psychological and psychiatric evaluations to

determine her ability to parent and any services that could assist her; and then offered individual therapy and parenting skills training.

Judge Buono Stanton determined that since its prior decision on August 31, 2021, Sara "ha[d] not engaged in any consistent services" and was difficult for the Division to contact. The judge noted that Sara was discharged from therapy programs for noncompliance. The judge also found, that at the time of the second trial, despite the Division's assistance, Sara remained unemployed and without stable housing, that she continually prevented the Division from assessing her current residence, and that she had "failed to complete any Division service aimed at reunification, other than attending some portion of the supervised visitation." The judge further found that the "quality" of the visits Sara did attend was "affected by [her] behavior," stating that, for example, she was "preoccupied with her hair and makeup during visits" and upset Kaleb by commenting negatively on his appearance.

Judge Buono Stanton summarized the Division's efforts to place the children with Mary both in New Jersey and in Canada. She also discussed the Division's communications with and assessments of numerous relative placements and its reasons for ruling them out. Most of the relative placements did not want to be caretakers for the children. The judge also found that Doreen

31

was committed to adopting Nora, and Jaime was committed to adopting Amy and Kaleb, that they both had backup plans for the children's care, that they understood "the difference between KLG and adoption," and that they were committed to maintaining the siblings' relationship.

Judge Buono Stanton summarized and credited the expert testimony provided by Drs. Wells and Kirschner about the bonding evaluations they performed, and Dr. Wells's testimony regarding her psychological evaluation of Sara. The judge noted that Dr. Kirschner was "highly concern[ed]" that Sara failed to attend her scheduled psychological and bonding evaluations with him, when considered "in conjunction with the findings of previous evaluations, which indicated that [Sara] is unable to meet her children's needs."

As in her previous decision, Judge Buono Stanton again found the Division had established prong one of the best interests analysis under N.J.S.A. 30:4C:15.1(a). She noted that Sara had never provided day-to-day care or nurturing to Amy, and did not do so for Kaleb or Nora "for a protracted period of time from 2017 to [the] present." The judge found that Sara received no prenatal care for Amy and had no housing plan for her when she was born. She further found that Nora sustained second-degree burns to her legs while in Sara's care, that Sara had often left her children alone and unsupervised, and that Sara

had more than once been asked to leave a shelter or apartment and had no plan for where she and the children could live.

The judge found that since her first decision, Sara had "persistently failed to perform any meaningful parental functions to provide any of her children with care, stability[,] and permanency," and had failed to complete and outright refused needed services. She also cited Sara's inconsistency with visitation and poor behavior when she did attend, and her lack of consistent employment.

The judge found that Sara's "lack of stability and seeming lack of interest in securing a home and providing parental attention" was a "grave concern." She concluded the Division had demonstrated by clear and convincing evidence that the children's "health, safety[,] and development were endangered by the parental relationship with [Sara]."

As to prong two, Judge Buono Stanton again pointed to Sara's continued failure to provide "proof of employment, stable housing or any parenting plan for" Kaleb, Nora, or Amy. Further, she stated "[Sara's] lack of regular, consistent and quality visits [wa]s more than enough . . . for [the] court to find she ha[d] withheld critically necessary parental attention and care to her children." The judge noted that despite the Division's assistance with transportation, "including car pick-ups, bus tickets, and train passes," Sara

cancelled and arrived late to many visits, causing the children to experience "disappointment." The judge reiterated that Sara fell asleep, engaged in self-care activities, and focused on her cell phone during visits, ignoring the children.

Judge Buono Stanton discussed the expert testimony from both trials opining that Sara had "severe parenting deficits" and "personality problems" that contributed to her history of unstable housing and inability to provide proper childcare. The judge noted that during her 2021 psychological evaluation with Dr. Kanen, the doctor asked Sara "why it ha[d] been so difficult to get her children back," and she replied, "I don't know. They block me. It's not my fault." The judge gave weight to Dr. Kanen's unrebutted testimony, stipulated to in the second trial, that Sara "has poor [judgment], is unreliable, inconsistent, [and] 'extremely' self-centered, feels very entitled, [is] insensitive to the needs of the children, and placed her own needs over her children." The judge credited Dr. Kanen's conclusion that "the children would be placed at an unnecessary risk of harm if placed in [Sara's] care."

Judge Buono Stanton also gave weight to Dr. Wells's testimony that Sara "continues to be insensitive to the effects out of home placement has had on the children" and that Sara "has no emotional capacity to assume any parental role or care for her children." She also noted that Dr. Wells concluded that Sara did

34

not show "willingness to implement the requisite changes" to her life and behavior that were "necessary for reunification."

The judge found that through its involvement with the family, which had "span[ned] over a decade," the Division had "conducted significant evaluations, examining [Sara] on an individual basis, as well as her bond with her children." She found that based on the record, Sara had "demonstrated substantial parental shortcomings, both in practice as a parent, and during clinical observations." The judge concluded that the Division had proven by clear and convincing evidence that Sara was "unable and unwilling to eliminate the harm facing [Kaleb, Nora, and Amy] and the delay of permanent placement will only exacerbate that harm."

In addressing prong three, Judge Buono Stanton first considered the services the Division provided to Sara and found they were sufficient and appropriate. She again discussed the Division's assistance with visitation and temporary placement in shelters. She also found the Division tried to help Sara obtain employment by referring her to job fairs, sending her job listings, and providing babysitting while she job hunted. Additionally, the judge found the Division had referred Sara to parenting skills training and therapy, but that Sara had "never engaged consistently" with these services and "recently in 2022 was

35

terminated from [a program] for noncompliance." The judge concluded that to date, Sara had made "no progress . . . to address any issues that led to the children's removal and to effectuate reunification."

Judge Buono Stanton next considered whether the Division had made reasonable efforts to explore alternatives to termination. She reiterated all the relatives the Division had considered, finding that most had stated outright that they did not want to care for any of the children. The judge stated the Division had "cured" the deficiency she found after the first trial.

The judge noted the Division facilitated visits between Mary and the children and "made efforts to assist" her in obtaining an apartment in New Jersey, even paying a security deposit for her and ensuring renovations were completed. The Division also "went to significant lengths to assist [Mary] with the immigration process," by giving her instructions on how to apply for a visa and offering to help her meet with an immigration attorney. The judge found that despite these efforts, Mary never moved to New Jersey. The judge also found the Division properly explored the possibility of placing the children with Mary in Canada, but this could not move forward because adoption was not possible without Sara's rights first being terminated.

Judge Buono Stanton concluded that since the first trial, the Division had "gone to significant lengths to explore" relative placements. She stated she was "no longer concerned that the possible alternatives to termination of parental rights were not fully considered." The judge found the Division had established prong three by clear and convincing evidence.

As to prong four, the judge considered the results of the bonding evaluations Dr. Wells performed of the children with Sara and their respective resource mothers in July and December 2022, and those performed by Dr. Kirschner of Nora with Doreen, and Kaleb with Jaime in January 2023. In particular, the judge noted that these experts had both found that the children would suffer significant emotional and psychological harm if separated from their resource parents but would experience little to no distress if their relationships with Sara were severed. The judge concluded that based on the "comprehensive, unrebutted, expert evaluations," the Division had proven by clear and convincing evidence that termination of Sara's parental rights would not do more harm than good. The court terminated Sara's rights to the three children on June 14, 2023.

On appeal, Sara argues that the court erred in terminating her parental rights because the Division did not prove the elements of the best interests of

the child test set forth in N.J.S.A. 30:4C-15.1.  The Law Guardians for the children urge this court to affirm the trial judge's order.

Our review of a decision to terminate parental rights is limited.  N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007).  We must determine whether the decision is supported by substantial and credible evidence.  N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012).  We will defer to the trial court's factual findings, because that court has a superior ability to gauge witness credibility and "possesses special expertise in matters related to the family."  Ibid.  The conclusions that flow from those findings are also entitled to deference.  N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 89 (App. Div. 2006).  Ultimately, a family court's decision should not be overturned unless it went so "wide of the mark" that reversal is needed "to correct an injustice."  F.M., 211 N.J. at 448 (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)).

"Parents have a constitutional right to raise their children," id. at 447, but it is tempered by the State's responsibility to protect the welfare of children.  In re Guardianship of J.N.H., 172 N.J. 440, 471 (2002).  Because termination permanently severs the legal relationship between parent and child, it should be ordered only where "proof of parental unfitness is clear."  F.M., 211 N.J. at 447.

The court must focus its inquiry upon the best interests of the child. Ibid.

Parental rights should only be terminated when:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

These four criteria "are not discr[ete] and separate, but overlap with each other . . . to identify a child's best interests." N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 434 (App. Div. 2001). The burden is upon the State to demonstrate by clear and convincing evidence that a parent "has not cured the initial cause of harm and will continue to cause serious and lasting harm to the child." In re Guardianship of J.C., 129 N.J. 1, 10 (1992). "[A]ll doubts must be resolved against termination of parental rights." In re

Guardianship of K.H.O., 161 N.J. 337, 347 (1999).  The court must consider "not only whether the parent is fit, but also whether he or she can become fit within time to assume the parental role necessary to meet the child's needs." R.L., 388 N.J. Super. at 87.

After careful review, we are satisfied Judge Buono Stanton properly considered all the statutory prongs of the best interests test and found the Division met its burden by clear and convincing evidence.  We affirm substantially for the reasons expressed in her well-reasoned opinion.

In considering prongs one and two, the judge did not improperly focus on Sara's poverty as she contends.  While Sara's homelessness may be due to a relative lack of means, the judge did not give undue weight to this factor, instead considering it alongside several others.

First, Sara has never cared for Amy; Nora suffered second-degree burns while in her care; Sara often left all her children unsupervised; and her behavior caused her eviction from an apartment, multiple shelters, and her uncle's home when she had no other plan in place for her children's housing.

Second, Sara's failure to find housing where her children could join her may have been due in part to poverty but also resulted from her lack of effort to seek and maintain gainful employment despite the Division's assistance.

Third, as the judge repeatedly stated, Sara was inconsistent with visitation, was often late to the visits she did attend, and often ignored the children in favor of using her phone or doing her hair and makeup. While some of Sara's visits may have included "positive" behavior, the record is replete with evidence supporting the judge's finding that these instances were outweighed by those where she showed a lack of attention or care.

Fourth, the judge discussed the expert testimony and reports indicating that Sara had personality disorders that contributed to her history of unstable housing and failure to provide adequate care to the children when they lived with her or during visits after removal. The judge's consideration of Sara's psychological issues was appropriate, as her conditions had deleterious effects on the children; she subjected them to instability, blamed others for her shortcomings, was often difficult to locate even for visitation, and has essentially withdrawn her parental affection and care from the children.

Finally, the record showed that Sara's participation in needed services was sporadic and marked by repeated discharges for lack of attendance and noncompliance. Although Sara did make significant progress toward the goal of "addressing her trauma," as she argues on appeal, the record demonstrates that she did not make any meaningful strides toward addressing or curing the

issues that caused the removal of her children. Indeed, she started and dropped out of therapy so many times that the service provider refused to take any more referrals for her. In addition, Sara failed to attend the most recent scheduled psychological and bonding evaluations with Dr. Kirschner despite knowing the second guardianship trial was impending. She also regularly refused services and did not respond to the Division's communications about the case throughout the several years of its involvement with the family. In the meantime, Kaleb and Nora have remained without their mother since 2017, and Amy has never known her as a caregiver.

In short, Sara has demonstrated that she gives low priority to achieving the stability necessary for reunification. As a result, the children have suffered harm and there is no indication that Sara is willing or able to ameliorate that harm.

In addressing prong three, Sara asserts the Division inappropriately focused on Mary to her exclusion. We disagree. In her opinion following the first trial, Judge Buono Stanton ordered the Division to more fully explore Mary as a relative placement for the children. The Division complied with that order, attempting to provide Mary with housing assistance while also continuing to assist Sara.

A-3549-22

In the June 2023 opinion, Judge Buono Stanton found the Division assisted Sara with finding stable housing. The evidence establishes that the Division paid for Sara to stay in shelters and hotels with the children and sent her information about apartments in New Jersey and New York post-removal. Sara failed to look at this information in a timely fashion and did not follow up on any of the leads. The Division also provided Sara with help to find work, transporting her to at least one job fair and telling her about others, and sending her job listings. Sara did not take advantage of any of this assistance, remained unemployed, refused to provide any details about jobs she allegedly held for short periods of time, and failed to save any money.

The judge also found the Division offered Sara regular visits with the children and referred her many times to therapy and parenting skills programs. That these efforts ultimately failed to facilitate reunification was not the Division's fault, as Sara continually failed to attend scheduled sessions, visits, and meetings and was repeatedly discharged from therapeutic services. "When a parent 'refuse[s] to engage in therapy or other services,' that factor suggests efforts to reunite the family are no longer reasonable." N.J. Div. of Child Prot. & Permanency v. A.S.K., 457 N.J. Super. 304, 328 (App. Div. 2017) (alteration in original) (quoting N. J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591,

610 (1986)).  The judge did not err in finding the Division provided reasonable services to Sara under N.J.S.A. 30:4C-15.1(c).

We find Sara's argument meritless that the Division did not fully explore alternatives to the termination of parental rights.  The record reflects the Division considered numerous relatives for placement, most of whom did not wish to act as caregivers.  If the Division determines that a relative is unwilling or unable to assume care of the child, it is not required to re-evaluate him or her later.  N.J.S.A. 30:4C-12.1(b).  Thus, the judge properly relied on the Division's earlier decisions ruling out various relatives.

Judge Buono Stanton also discussed in detail the Division's efforts to help Mary obtain housing in New Jersey and to, alternatively, begin the process of an international adoption, and the ultimate discontinuation of those efforts due to Mary's failures to follow through.  She also noted Drs. Wells's and Kirschner's opinions concerning the lack of parental bonds between the children and Mary.

We also reject Sara's argument that there was insufficient evidence that Doreen and Jaime understood the differences between KLG and adoption before they stated a preference for the latter.  The Division's witnesses testified, and the documentary record confirmed, that they discussed the two options with Doreen and Jaime, who were also provided with a "Fact Sheet" comparing and

contrasting them. Doreen and Jaime confirmed this process occurred; both testified that Division workers spoke with them about the differences multiple times. Both women were clear that they understood what KLG and adoption each entailed and had arrived at an informed preference for adoption. The judge did not err in concluding that the Division established prong three of the best interests test.

In addressing prong four, Sara asserts the judge gave "undue weight" to Drs. Wells's and Kirschner's expert opinions in finding the Division satisfied the prong. Sara contends that Dr. Kirschner should not have been permitted to opine on whether she could parent the children, because he "never interviewed or observed her and relied primarily on the hearsay opinions of other experts."

Prong four addresses whether termination "will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). In evaluating prong four, a court must inquire into and compare the children's relationships with their biological and resource parents. K.H.O., 161 N.J. at 355. There is an inherent risk stemming from the loss of the custody of a birth parent. Ibid. However, a court must also consider "the paramount need . . . children have for permanent and defined parent-child relationships." J.C., 129 N.J. at 26. Thus, prong four does not require that "no harm will befall the child as a result of the severing of biological

ties."  K.H.O., 161 N.J. at 355.  Instead, the court must balance the child's relationships with her birth and resource parents and determine whether the child will suffer greater harm from the termination of ties with the former than with the latter.  J.N.H., 172 N.J. at 478.  The State should offer testimony of an expert who has made "a comprehensive, objective, and informed evaluation" of the child's relationships.  J.C., 129 N.J. at 19.  Termination is appropriate where it "will result, among other things, in a permanent resolution of the child's status."  A.W., 103 N.J. at 610.

The courts have held that "'termination of parental rights likely will not do more harm than good' where the child has bonded with the resource parents in a nurturing and safe home."  N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 492 (App. Div. 2012) (quoting E.P., 196 N.J. at 108).  The Division therefore may establish prong four by presenting clear and convincing evidence "that separating the child from his or her foster parents would cause serious and enduring emotional or psychological harm."  J.C., 129 N.J. at 19.  However, because the biological parent's rights are so important, termination cannot be based entirely on the child's strong bond with his foster parents without a concomitant finding of parental fault, even if the child will be greatly

46

harmed by the bond's severance.  <u>N.J. Div. of Youth & Fam. Servs. v. D.M.</u>, 414 N.J. Super. 56, 74-75 (App. Div. 2010).

We discern no error in the trial judge's reliance on Drs. Wells's and Kirschner's reports when assessing prong four.  Although these experts admitted they did not review every single page in the Division's file before rendering their opinions, they did review key testimony and reports and made their own observations during their respective evaluations.  The record was replete with evidence that Sara did not provide proper supervision, attention, or care to Kaleb and Nora while they lived with her.  Further, following the children's removal, Sara was given ample opportunity to display her parenting skills during visits, yet she cancelled or failed to appear, and at many visits she did attend, she arrived late or tended to her own desires instead of interacting with the children.  Drs. Wells's and Kirschner's opinions were supported by sufficient evidence.

We find meritless Sara's contention that Dr. Kirschner should not have been permitted to opine on her parental fitness because he did not interview her. Sara chose not to attend the interview or bonding evaluation scheduled with him. This, in itself, made Dr. Kirschner "highly concerned" about her willingness and ability to care for the children, and it was appropriate for the judge to take that into consideration alongside the mountain of evidence indicating that Sara

lacked insight into how her actions could affect the children and lead to the termination of her parental rights.

Moreover, the judge's conclusions on prong four were not based solely on Dr. Kirschner's opinions, but on Dr. Wells's too. Dr. Wells conducted a full interview, psychological evaluation, and bonding evaluation of Sara, and she, like Dr. Kirschner, opined that Sara would not be able to parent the children safely in the foreseeable future.

There was considerable evidence that Kaleb, Nora, and Amy had formed positive, nurturing, and loving relationships with their respective resource mothers, who were committed to adopting them. Multiple bonding evaluations by several professionals led to the same conclusions: that removing the children from their resource parents would do them serious psychological harm, while severing their relationship with Sara would cause no distress at all. This is not a case where termination of parental rights will leave the children in limbo. Instead, Kaleb, Nora, and Amy will be able to achieve permanency and maintain the stability in their lives that Doreen and Jaime have provided, which Sara could not. Judge Buono Stanton properly concluded the Division demonstrated that termination would not do more harm than good, establishing prong four.

48

The trial judge's decision terminating Sara's parental rights was supported by sufficient credible evidence and was not so "wide of the mark" as to warrant reversal.  F.M., 211 N.J. at 448 (quoting E.P., 196 N.J. at 104).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-3549-22